UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ROBERT BELL,<br><br>                      Plaintiff,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION, et al.,<br><br>                      Defendant. | Case No.:  14cv1397 BEN (PCL)<br><br>**REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. 80]** |

**I. INTRODUCTION**

David Robert Bell ("Plaintiff") alleges three violations of the Civil Rights Act, 42 U.S.C. §§ 1983, et seq., related to his medical care while incarcerated at Richard J. Donovan State Correctional Facility. (Doc. 1.) Plaintiff seeks monetary relief jointly and severally against each defendant. (Id.)

Before this Court is a Motion for Summary Judgment made pursuant to Federal Rule of Civil Procedure 56 by the California Department of Corrections and Rehabilitation, Dr. K Thompson, Nurse Pamela Velardi, Nurse Bersamin, John Does 1 through 10, and Jane Does 1 through 10 ("Defendants"). (Doc. 80.) The Honorable Roger T. Benitez referred the matter to the undersigned Judge for Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) and Local Civil Rule 72.1(c)(1)(d). After a thorough review of the pleadings and supporting documents, this Court recommends that the Defendants' Motion for Summary Judgment be **GRANTED**.

## II. PROCEDURAL BACKGROUND

Plaintiff alleges the following civil rights violations in his Complaint: (1) Defendants failed to provide adequate medical care; (2) Defendants were ignorant of Plaintiff's medical diagnosis and failed to adequately attend to his care; (3) Defendants were deliberately indifferent to Plaintiff's serious medical needs; (4) Defendants denied Plaintiff proper medical care; (5) Defendants' medical acts or inactions contributed to Plaintiff's future medical harms; and (6) Defendants breached an implied contract to provide reasonably sufficient medical care. (Doc. 1.) Following an earlier Motion for Summary Judgment, only Plaintiff's first, second, and fourth claims remain. (Docs. 86, 87.) Further, Plaintiff's claims against Defendants Glynn, Walker, and Seeley were deemed improper and dismissed. (Id.)[1]

Defendants move for summary judgment claiming qualified immunity. (Doc. 80.) Plaintiff filed his Opposition on June 6, 2014 and Defendants replied on June 6, 2014. (Docs. 82; 84.)

## III. FACTUAL BACKGROUND

### A. Medical History[2]

While incarcerated, Plaintiff made numerous complaints of spinal and shoulder pain starting with his first request for medical attention in May 2012. (Doc. 80-3 at 19.) Plaintiff reported suffering shoulder and back injuries as a result of his work in the prison kitchen. (Id.) Plaintiff was examined by Nurses Bersamin and Velardi, with Velardi noting that

---

[1] Defendants filed this second Motion for Summary Judgment before the first had been ruled on. To the extent that the instant Motion references Defendants and causes of action that are no longer live, the Court will consider them moot and will not discuss them here.

[2] Plaintiff's medical history is taken from records provided by Defendants as exhibits to their Motion for Summary Judgment.

Plaintiff both wanted to change jobs and wanted an MRI. (Id. at 21.) Plaintiff was further examined by a physical therapist and a family nurse practitioner later that month. (Doc. 80-2 at 6.) The notes from his May 29, 2012 exam indicate that while Plaintiff complained of shoulder pain and was unready to return to work, he displayed a full range of motion in his left shoulder. (Doc. 80-3 at 25.)

Plaintiff was examined four times between June 6-7, 2012. (Id. at 26-33.) On June 6, Bersamin submitted a second request for Plaintiff to be X-Rayed, noting that her first request went unfulfilled. (Id. at 27.) Less than three hours later, Plaintiff was examined by Bersamin again, complaining of extreme lower back pain. (Id. at 29.) Bersamin prescribed a muscle relaxant, added Tylenol to his pain medication, and ordered Plaintiff to continue with his already-prescribed medications. (Id.) On June 7, Plaintiff complained of continued lower back pain and indicated that the medicine he was taking wasn't working. (Id. at 31.) Notes from this visit indicate Plaintiff was able to move from sitting to standing without assistance, however slowly. (Id.) The progress note states Plaintiff had a steady gait but was persistently "uncooperative." (Id.) Roughly two hours later, Plaintiff restated his extreme pain to Nurse Parages and that he was unable to get himself to the canteen for meals. (Id. at 33.) Parages informed Plaintiff that he needed to walk for his scheduled X-Ray and suggested Plaintiff attempt to stretch. When Plaintiff expressed reluctance, Parages examined his back. She reported no protruding bones and that Plaintiff did not grimace when she touched him. (Id.) Parages' note indicated Plaintiff was, despite multiple attempts by multiple medical staff, still reluctant to listen when she told him to take his medication. (Id.)

Plaintiff's left shoulder was X-Rayed on June 8, 2012, showing evidence of a subacute nondisplaced fracture at the distal clavicle. (Id. at 35.) A later comparison X-Ray showed Plaintiff's fracture was healing properly. (Id. at 37.)

On June 8, 2012, Plaintiff was examined by FNP Seifullah. (Id. at 39.) Plaintiff told her that he did not suffer any specific injury to his back that caused his persistent pain, but that it simply "gave out." (Id.) Plaintiff was then prescribed Toradol and Indocin injections

3

and Decadron for his pain. (Id.) During a June 12, examination with Velardi, Plaintiff indicated that while he had previously reported no injury, he had in fact fallen on May 18, 2012. (Id. at 41.) Plaintiff requested to leave the clinic before he was examined. (Id.) Additionally, Velardi reported Plaintiff was threatening, uncooperative, and hostile, stating "I'm going to sue you and take your job." (Id.) On June 28, 2012, Plaintiff reported to Dr. Sedighi that his back pain was improving following taking illegally acquired morphine. (Id. at 43.)

Plaintiff was again examined by Bersamin on July 5, 2012. (Id. at 45.) In his request for health care services, Plaintiff indicated that an X-Ray on his back was "neg" and that he believed a MRI would be appropriate. (Id.) Notes from a telemedicine clinic visit with Dr. Christian Bentley on July 9, 2012, indicated Plaintiff complained of pain radiating in both legs, that he has difficulty walking and stands in a stooped position, and is wheelchair-bound. (Id. at 48.) Dr. Bentley indicated Plaintiff's shoulder fracture needed no further follow-up, but that Plaintiff would "probably benefit" from a MRI and a neurosurgical orthopedic spine surgeon referral for evaluation. (Id.)

On July 14, 2012, Plaintiff was examined at the Triage and Treatment Area for extreme pain. (Doc.080-3 at 50-51.) Triage notes indicate Plaintiff was able to move all extremities and once again denied recent injury. (Id.) Within an hour of being admitted to triage, Plaintiff was reporting improving levels of pain and increased comfort. (Id. at 51.) Plaintiff was next examined by Dr. Martinez on July 19, 2012 (Id. at 53-55.) Dr. Martinez adjusted some of Plaintiffs medications and ordered a non-emergent lower spine MRI "ASAP." (Id.)

Plaintiff's August 3, 2012 MRI showed a paraspinal abscess surrounding the L5-S1 disc. (Id. at 59.) The mass was roughly 3x3x4 centimeters in size, extending into nerve roots. (Id.) The following day Kevin Yoo, M.D., examined Plaintiff, diagnosing Plaintiff with early cauda equine syndrome. Dr. Yoo recommended a laminectomy and evacuation of the epidural abscess. (Id.)

Following surgery Plaintiff's condition was reportedly "doing well with IV antibiotics." (Id. at 64.) Plaintiff was treated with morphine following his surgery until a doctor deemed it unnecessary and issued orders to taper-off Plaintiff's dosage. (Id. at 66-68.)

### B. Drug Abuse History

Plaintiff's history of drug abuse while incarcerated dates back to at least October 1988 when he was reported to have sought drugs for back pain while indicating no dysfunction. (Id. at 6.) Mental health progress notes from August 2001 indicate Plaintiff "appears to psychosomatize his problems with continued physical complaints," and that Plaintiff has a history of alcohol abuse. (Id. at 8.) In November of 2008 Plaintiff was found in his cell unresponsive, not breathing, with pinpoint pupils. (Id. at 15.) Because Plaintiff responded to the Narcan administered by medical staff, it was presumed that Plaintiff had taken a narcotic overdose, likely heroin. (Id.) A July 2010 progress note detailed medical staff suspicion that Plaintiff was diverting another inmate's morphine prescription. During Plaintiff's May 18, 2012 examination by Velardi upon first complaining of shoulder pain, Velardi noted Plaintiff had pinpoint pupils and ordered a drug screen. (Id. at 21.) May 20, 2012 records indicate that Plaintiff had tested positive for morphine despite not having a prescription for the drug. (Id. at 23.) Further, when Plaintiff was not satisfied with the course of medicines he had been prescribed to treat his lower back pain, Plaintiff admitted to medical staff that he had purchased morphine "on the yard." (Id. at 43.)

## IV. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment will be granted, entitling the moving party to a judgment as a matter of law, when the moving party has demonstrated that there exists "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2). If the moving party can demonstrate that no reasonable trier of fact could find other than in favor of the moving party, entry of summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

1  When the issue in question is one that the opposing party must prove at trial, the moving party is only required to indicate that "there is an absence of evidence in support of the nonmoving party's case" for summary judgment to be granted. Id. at 325. If the nonmoving party fails to completely prove an essential element of their case, all other facts are rendered immaterial. Id. at 323. Once the moving party has sufficiently demonstrated the nonmoving party's lack of supporting evidence, the burden then shifts to the opposing party to establish that a genuine issue of material fact does exist. Matsushita Elec. Indus. Co. v. Zenither Radio Corp., 475 U.S. 574, 586 (1986).

Once the burden has shifted, the nonmoving party must establish the existence of the factual dispute by tendering evidence of specific facts through affidavits or admissible discoverable material, rather than relying simply on conclusory allegations. Fed. R. Civ. Pro. 56(e); Matsushita, 475 U.S. at 586. Through reasonable inferences are drawn in favor of the opposing party, the nonmoving party is obligated to produce the factual predicate from which those inferences are drawn. See Richards v. Nielsen Freight Lines, 692 F.Supp. 1224, 1244045 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). If the nonmoving party fails to present evidence in support of the existence of material facts, summary judgment will be granted. Matsushita, 475 U.S. at 587.

In ruling on a motion for summary judgment, the court need not accept legal conclusions "cast in the form of factual allegations." Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981). "No valid interest is served by withholding summary judgment on a complaint that wraps nonactionable conduct in a jacket woven of legal conclusions and hyperbole." Vigliotto v. Terry, 873 F.2d 1201, 1203 (9th Cir. 1989).

**B. Qualified Immunity**

Qualified immunity entitles government officials to "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted). Generally, qualified immunity doctrine must "'give ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991). The intent of qualified immunity is to shield an officer from personal liability when that officer acted with a reasonable belief that their conduct was in compliance with the law. Pearson v. Callahan, 555 U.S. 223, 244 (2009). The Supreme Court has embraced an objective test under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

"Qualified immunity is particularly amenable to summary judgment adjudication because 'the entitlement is an immunity from suit rather than a mere defense to liability.'" Martin v. City of Oceanside, 360 F.3d 1078 1081 (9th Cir. 2004) (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991)). A court determining a motion for summary judgment based on a claim of qualified immunity must determine whether, viewing the evidence in the light most favorable to the non-moving party, the moving party has shown that there are no genuine issues of material fact in order to grant summary judgment. See Id. Once a §1983 defendant produces enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own; a district court is not allowed to simply assume the truth of challenged factual allegations in the complaint

The United States Supreme Court outlined a two-step qualified immunity analysis in Saucier v. Katz, 533 U.S. 194 (2001), requiring district courts to first determine whether the officer's conduct violated a constitutional right. Saucier, 533 U.S. at 201. If no constitutional right was violated, the court need not inquire further. Id. If a constitutional violation has occurred, the court's second inquiry under Saucier is to ask whether the law was "clearly established" at the time of defendants' alleged misconduct. Id.

## V. DISCUSSION

Plaintiff's remaining three claims contend that (1) Defendants failed to provide adequate medical care, (2) Defendants were ignorant of Plaintiff's medical diagnosis and failed to adequately attend to his care, and (3) Defendants denied Plaintiff proper medical care. (Doc. 1.) In the instant Motion, Defendants contend that all claims fail as the uncontested evidence shows that Plaintiff has not met his burdens to (1) demonstrate infringement of a clearly established body of law demonstrating Defendants were unlawful in treating Plaintiff, and (2) demonstrate that Defendants infringed on any of Plaintiff's rights, were they established. As such, Defendants argue they are entitled to qualified immunity. (Doc. 80-1 at 1.) In opposition, Plaintiff argues summary judgment on qualified immunity grounds is improper given factual disputes regarding Defendants' conduct or motive. (Doc. 82 at 11.)

### A. Whether Defendants' Conduct Violated A Constitutional Right

State governments have the obligation to provide medical care for those whom they are punishing by incarceration. See Estelle v. Gamble, 429 U.S. 97, 103 (1976). The infliction of unnecessary suffering on a prisoner though the failure to treat his medical needs is inconsistent with the contemporary standards of decency and violates the Eighth Amendment. See id. A plaintiff bringing a §1983 claim alleging a violation of the Eighth Amendment based on the failure of a prison official to treat his medical needs must establish that the prison official or officials acted with "deliberate indifference" to a "serious medical need." See Id. at 104; Wakefield v. Thompson, 177 F.3d 1160, 1164 (9th Cir. 1999).

The Ninth Circuit has explained that the test for deliberate indifference consists of two parts. See Jett v. Penner, 439 F.3d 1091, 1096 (2006).

> First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong – defendant's response to the need was deliberately indifferent

> – is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."

Id. (internal citations omitted).

A prison official acts with deliberate indifference only if the official knows of and disregards an excessive risk to an inmate's health and safety. See Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004). Even if a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. See id. Furthermore, while poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not satisfy the requirement of deliberate indifference. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990); see also Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) ("Mere medical malpractice does not constitute cruel and unusual punishment.").

Medical care less prompt or efficient than a free citizen might receive also does not constitute deliberate indifference. See Wood, 900 F.2d at 1335. In order for delay in treatment to constitute an Eighth Amendment violation, the delay must cause substantial harm. See Id. (holding that a delay in treatment did not substantially harm the plaintiff since the only remedy immediately available was a prescription for pain killers); see also Shapely v. Nevada Bd. Of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) ("[M]ere delay of surgery without more, is insufficient to state a claim of deliberate medical indifference….").

Prisoners can establish an Eighth Amendment violation with respect to medical care and treatment if they can prove there has been deliberate indifference to serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim, the prisoner must prove that he was confined under conditions posing a risk of objectively serious harm and that prison officials had a sufficiently culpable state of mind in denying him proper medical care. Wallis v. Baldwin, 70. F.3d 1074, 1076 (9th Cir. 1995). Thus, the relevant inquiry

involves both an objective and a subjective component. <u>Clement v. Gomez</u>, 298 F.3d 898, 904 (9th Cir. 2002).

### 1. Objective Component

In order to establish the objective component of an Eighth Amendment claim based on deliberate indifference to serious medical needs, a plaintiff must demonstrate his medical need was sufficiently serious such that the failure to treat the prisoner's condition could have resulted in further significant injury or the unnecessary and wanton infliction of pain. 42 U.S.C. § 1983; <u>Estelle</u>, 429 U.S. at 104; <u>Jett</u>, 439 F.3d at 1093; <u>Clement</u>, 298 F.3d at 904. "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are…indications that a prisoner has a serious need for medical treatment." <u>Lopez v. Smith</u>, 203 F.3d 1122, 1124 (9th Cir. 2000).

Here, Defendants do not contest that Plaintiff suffered from a severe spinal abscess that prison medical staff misdiagnosed in the examinations done in June and July of 2012. However, evidence presented by both parties indicates that Plaintiff was seen by medical staff and received treatment during each visit.

Plaintiff was examined five times in May 2012, seven times in June 2012, four times in July 2012, and received post-surgical care in August 2012. During each of the examinations, Plaintiff was properly assessed, treated for his conditions according to typical procedure, and received pain medication to alleviate his discomfort. Plaintiff received an MRI of his lumbar spine and was referred to a neurological orthopedic spine surgeon for evaluation pursuant to Dr. Christian Bentley's recommendation.

Defendants did not fail to treat Plaintiff, rather they treated Plaintiff according to their diagnosis. The only issue to be resolved is whether Plaintiff has provided evidence from which it reasonably can be inferred that Defendants acted with a sufficiently culpable state of mind to constitute deliberate indifference of an inmate's medical needs.

///

## 2. Subjective Component

The subjective component requires the prisoner to identify sufficient facts to indicate that prison officials acted with a culpable state of mind to constitute deliberate indifference. See Wilson v. Seiter, 501 U.S. 294, 299 (1991). A prison official demonstrates a culpable state of mind that is deliberately indifferent if they know that a prisoner faces a substantial risk of serious harm and they disregard that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Such indifference must be substantial; inadequate treatment due to inadvertence, malpractice, or even gross negligence, does not amount to a constitutional violation. See Estelle, 429 U.S. at 104; Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

As a matter of law, difference of medical opinion as to the need to pursue one course of treatment over another is insufficient to establish deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Medical care less prompt or efficient than a free citizen might receive also does not constitute deliberate indifference. See Wood, 900 F.2d at 1335. In order for delay in treatment to constitute an Eighth Amendment violation, the delay must cause substantial harm. See Id. (holding that a delay in treatment did not substantially harm the plaintiff since the only remedy immediately available was a prescription for pain killers); see also Shapely v. Nevada Bd. Of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) ("[M]ere delay of surgery without more, is insufficient to state a claim of deliberate medical indifference…."). Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted).

Here, Plaintiff fails to show how Defendants' response to Plaintiff's lower back pain demonstrates deliberate indifference to Plaintiff's medical condition. The medical record, taken as a whole, establishes a course of treatment that was both attentive to Plaintiff's pain and reasonable under the circumstances. Plaintiff was examined over a dozen times by

medical professionals who adjusted their treatment, recommendations, and prescribed medications in response to Plaintiff's pain.

The records show Plaintiff was examined by a number of different Nurses, Nurse Practitioners, and Physicians. As a result, it is not unreasonable to believe that the medical staff referred back to old treatment notes before assessing Plaintiff's condition and prescribing medication. To that end, any medical professional who read Plaintiff's medical record would find that Plaintiff has a long and varied history as both a drug seeker and drug abuser while incarcerated. Had the 1988 drug seeking incident been the only time Plaintiff was found to have improperly sought narcotics, medical staff in 2012 would probably not infer continued drug seeking behavior. However, Plaintiff was found under the influence of narcotics repeatedly in the intervening years, up to and including the day Plaintiff first complained of shoulder pain to Nurse Velardi. As a result, it is wholly reasonable under these circumstances to attribute Plaintiff's behavior to that of an addict seeking narcotics. Defendants here did not act in conscious disregard of an excessive medical risk to Plaintiff's health, but rather in conscious regard to a behavioral condition Plaintiff. Additionally, given Plaintiff's mental health history indicating a tendency to psychosomatize problems with physical complaints, Defendants' course of treatment was reasonable. Insuring Plaintiff's complaints of pain were not an effort to obtain narcotics or the result of a mental health issue was a reasonable medical practice.

Plaintiff contends deliberate indifference is established by the length of time between Plaintiff's first complaints of pain and his surgery. Additionally, Plaintiff argues his pleas for increased medical treatment fell on deaf ears because medical staff believed Plaintiff's condition was a rouse to obtain narcotics. The medical record, however, establishes that not only were Defendants more than willing to listen to and treat Plaintiff's medical condition, but also that Plaintiff was less than truthful and often an uncooperative patient.  He was routinely examined and the progress notes indicate lower back pain, but also include details such as lack of grimace and ability to ambulate. Further, Plaintiff complained of shoulder pain during his first visit in May 2012, and did not bring up lower

back pain until later visits. Had Plaintiff's first visit included lower back pain complaints, the time between that examination and being diagnosed with an abscess was still less than three months. While three months may indicate a minor delay in the ultimate surgery, Plaintiff's medical needs were being attended to, in accordance to his diagnosis at the time, throughout.

Plaintiff was eventually diagnosed with early stage cauda equine syndrome which was not likely to be discovered without an MRI. Plaintiff's complaints, combined with Defendants' experience and skill as medical providers, did not rise to the level of requiring an immediate MRI. This is not unreasonably delayed treatment, but rather an unfortunate missed diagnosis that is partially due to Plaintiff's medical history[3]. Plaintiff was inconsistent in his communications about the cause of his pain, at times stating there was no underlying injury and at another time telling a nurse he fell. There is no indication that had Plaintiff been more thoroughly examined upon first complaint of lower back pain, any issue would have been discovered. Plaintiff himself noted that a back X-Ray image was negative during a telemedicine visit.

Plaintiff provides no evidence that Defendants' treatment rose to the level of "plainly incompetent" nor does Plaintiff establish how Defendants' knowingly violated any laws. Additionally, Plaintiff does not present any evidence refuting Defendants' contention that delaying an MRI was medically acceptable under the circumstances. The medical records do not support a finding that treatment deliberately indifferent. There is no indication by Plaintiff that the time it took to have the MRI was even a "delay" instead of a conservative course of treatment. When looking at the circumstances as a whole, Defendants were presented with an inmate who had once before claimed back pain to obtain narcotics, illegally obtained and used narcotics, repeatedly, to the extent that he suffered an overdose, who was once again presenting back pain and testing positive for morphine. As such,

---

[3] Defendants do not dispute that a missed diagnosis occurred. (Doc. 80-2 at 10:1-4.)

Defendants took reasonable steps to provide medical care to Plaintiff and did not, as Plaintiff contends, actively disregard a known risk to his health.

For the reasons stated above, there are no triable issues of material fact remaining with respect to whether Defendants acted with deliberate indifference. Taken in the light most favorable to the Plaintiff, the evidence fails to demonstrate that Defendants violated Plaintiff's rights under the Eighth Amendment.

### B. Whether Plaintiff's Eighth Amendment Rights were Clearly Established and Whether Defendants Could Have Reasonably but Mistakenly Believed Their Conduct Did Not Violate a Clearly Established Constitutional Right

As discussed above, there is no genuine issue of material fact, and no constitutional violation arising from the Defendants' act. Therefore, the Court need not inquire as to whether the law was "clearly established" at the time of the alleged misconduct, and may apply qualified immunity to the Plaintiff's requests for monetary relief.

Based on the foregoing, the Court recommends **GRANTING** Defendants' Motion for Summary Judgment based on qualified immunity.

### VI. CONCLUSION

For the reasons outlined above, it is hereby recommended the Court issue an Order: 1) approving and adopting this Report and Recommendation; and 2) directing that Defendants' Motion for Summary Judgment be **GRANTED**.

**IT IS ORDERED** that no later than Thursday, August 11, 2016, 2016, any party to this action may file written objections and replies with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

///
///
///
///
///

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with
2    the Court and served on all parties no later than Thursday, August 25, 2016. The parties
3    are advised that failure to file objections within the specified time may waive the right to
4    raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449,
5    455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

7    Dated: July 27, 2016

Hon. Peter C. Lewis
United States Magistrate Judge

12   cc: The Honorable Roger Benitez
13       All Parties and Counsel of Record